Beau Burbidge (Utah Bar No. 17046)
beau@burbidgemitchell.com
Clancey Henderson (Utah Bar No. 17066)
chenderson@burbidgemitchell.com
BURBIDGE | MITCHELL
215 South State Street, Suite 920
Salt Lake City, Utah 84111
Telephone: (801) 355-6677
Facsimile: (801) 355-2341

*Counsel for Plaintiffs*

*[Additional Counsel Listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MINDY FRUHMANN, KIMBERLY DO, CANDACE TRAICOFF, and LYNNMARIE SEMENZA, individually and on behalf of all others similarly situated, | **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |
| Plaintiffs, <br><br> v. | Case No.: 2:26-cv-00272 |
| CRICUT, INC., | Judge: |
| Defendant. | |

Mindy Fruhmann, Kimberly Do, Candace Traicoff, and Lynnmarie Semenza ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant Cricut, Inc. ("Defendant" or "Cricut"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

1

## <u>NATURE OF THE ACTION</u>

1.      In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2.      Cricut operates a commercial website, https://cricut.com (the "Website"), through which users browse and purchase smart cutting machines, crafting tools, materials, and accessories; access and use Cricut's proprietary design software and digital content library; create and manage user accounts; obtain product support and educational resources; and explore promotions, subscriptions, and special offers. Like many modern websites, the Website displays a cookie banner (the "Cookie Banner") and a "cookie preferences" interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.



*Figure 1 – Cookie Banner and Cookie Settings of Cricut, representing that users could change tracking behavior through Cookie Settings*

3. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website, before they can interact with the Cookie Banner.

4. Users were misled by the Cookie Banner and Cookie Settings, which led users to believe that their data would only be shared when interacting with the Website.

5. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on user behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Website.

6. The Website ostensibly offers users the ability to disable cookies and disable the sale or disclosure of personal data, allowing only cookies that are strictly necessary ("non-essential") for Website functionality, by: (1) clicking the "Reject All" button in the Cookie Banner; (2) toggling off "Share or sale of personal data" in the Cookie Settings; and (3) toggling off the individual cookie sliders for all but "Strictly Necessary Cookies." Each of these actions has the same effect: to limit the Website's use of Tracking Tools only to those necessary for Website functionality and to otherwise disable the sale or sharing of personal data.

3

7. However, even after users affirmatively disable the sale or sharing of their Sensitive Information and reject all non-essential cookies, regardless of which mechanism used to achieve that goal, the Website continues to utilize and deploy Tracking Tools which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools (the "Tracking Entities").

8. Cricut's Cookie Settings deceive users by indicating that users are able to disable non-essential cookies and disable the sale or disclosure of personal data while the Website (1) places Tracking Tools on users' browsers, which allows the Tracking Entities to intercept users' communications with the Website before users have the ability to interact with the Cookie Banner, and (2) continues to use Tracking Tools that intercept and transmit Sensitive Information to Tracking Entities after users toggle off the sale/sharing of personal information and reject all non-essential cookies. Cricut's Website design and procurement of Tracking Entities and Tracking Tools to monitor, intercept, and transmit user data constitute invasion of privacy, intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a cookie opt-out mechanism and a user's ability to opt out of the sale/sharing of their personal information effectively deprives users of control over their personal information.

9. In short, the Website's Cookie Settings materially mislead users about the use and sale of their data. Defendant lulls users into a false sense of security, privacy, and control while simultaneously enabling third parties to monitor, intercept, and transmit users' online behavior in real time. Such conduct deprives users of control over their Sensitive Information and violates fundamental privacy protections.

10. Plaintiffs' experiences reflect the conduct described above. Plaintiffs, residents of California, Ohio, and New Jersey, respectively, visited Defendant's Website in or around 2024

and 2025 for ordinary consumer purposes, including browsing and comparing products, ordering products, and otherwise navigating the Website's content. While accessing the Website from their respective home states, Plaintiffs encountered the Cookie Banner and related Cookie Settings. Relying on Defendant's representations that marketing and tracking technologies would be disabled upon Plaintiffs' selections in the Cookie Settings, Plaintiffs affirmatively accepted the use of only strictly necessary cookies and affirmatively rejected consent to all other Tracking Tools. Despite these actions and expectations, Defendant deployed Tracking Tools that automatically intercepted, recorded, and transmitted Plaintiffs' Sensitive Information to the Tracking Entities. Plaintiffs reasonably relied on Defendant's representations regarding control of the Tracking Tools and privacy protections, yet their personal information was nonetheless collected and shared without their valid consent.

11. Plaintiffs visited the Website and communicated information to Defendant through their browsers, including browsing activity, product views, and interaction data reflecting their interests. Plaintiffs rejected non-essential cookies through Defendant's cookie controls in an effort to prevent third-party tracking. Defendant nonetheless caused Tracking Tools to intercept and transmit those communications and associated identifiers to third parties. Plaintiffs were thereby subjected to unauthorized disclosure of their communications and deprived of the benefit of the privacy choice that Defendant represented users could make.

12. Defendant invaded Plaintiffs' fundamental right to privacy and fraudulently misrepresented the Website's data-collection practices by facilitating the Tracking Entities' unlawful interception of and intrusion into Plaintiffs' Sensitive Information. In doing so, Defendant violated the federal Wiretap Act, 18 U.S.C. §§ 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful

use of a pen register or trap and trace device); California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq., California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq.; the California Constitution at Cal. Const., Art. I, § 1; the Ohio Wiretapping and Electronic Surveillance Act ("OWESA"), Ohio Rev. Code §§ 2933.51, et seq.; and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

14.     This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District.

15.     Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District. Lastly, the venue is proper in this District because Defendant is subject to this Court's personal jurisdiction with respect to this action.

**PARTIES**

16.    Plaintiff Mindy Fruhmann is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Fruhmann accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Fruhmann visited the Website in or about April 2024 for consumer browsing purposes. Plaintiff Fruhmann consistently declines non-essential cookies on all websites she visits as a matter of personal privacy practice. In connection with her visit to Defendant's Website, Plaintiff Fruhmann engaged with Defendant's Cookie Banner and Cookie Settings, disabled the sale or sharing of her Sensitive Information, and declined all non-essential cookies, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Fruhmann reasonably believed that by rejecting non-essential cookies and only allowing strictly necessary cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Plaintiff Fruhmann more recently visited the Website on March 31, 2026, in connection with the investigation of this case, and attempted to disable the Tracking Tools on the Website by using the Cookie Banner and Cookie Settings to decline all non-essential cookies. Despite Plaintiff Fruhmann's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Fruhmann's browsing activity, device identifiers, and related metadata to the Tracking Entities. The interception disclosed the substance of Plaintiff Fruhmann's communications with the Website, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Fruhmann's clear refusal of non-essential tracking technologies. As a result, Plaintiff Fruhmann's Sensitive Information was intercepted and recorded without her consent. Had Plaintiff Fruhmann known that Defendant's representations in

7

the Cookie Banner and Cookie Settings were false, she would not have relied on Defendant's misrepresentations, would not have continued to use the Website, and would not have made any purchases on the Website.

17.    Plaintiff Kimberly Do is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Do accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Do visited the Website in or about July 2025 for consumer browsing purposes. Plaintiff Do consistently declines non-essential cookies on all websites she visits as a matter of personal-privacy practice. In connection with her visit to Defendant's Website, Plaintiff Do engaged with Defendant's Cookie Banner and Cookie Settings, declined all non-essential cookies, and disabled the sale or sharing of her Sensitive Information, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Do reasonably believed that by rejecting non-essential cookies and only allowing strictly necessary cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Do's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Do's browsing activity, device identifiers, and related metadata to the Tracking Entities. The interception disclosed the substance of Plaintiff Do's communications with the Website, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Do's clear refusal of non-necessary tracking technologies. As a result, Plaintiff Do's Sensitive Information was intercepted and recorded without her consent. Had Plaintiff Do known that Defendant's representations in the Cookie Banner and Cookie Settings were false, she would not

8

have relied on Defendant's misrepresentations, would not have continued to use the Website, and would not have made any purchases on the Website.

18.     Plaintiff Candace Traicoff is, and at all relevant times has been, a citizen and resident of the State of Ohio. Plaintiff Traicoff accessed and used Defendant's Website while physically located in Ohio. Most recently, Plaintiff Traicoff visited the Website in or about November 2025 for consumer browsing purposes. Plaintiff Traicoff does maintain an account with Defendant and has made purchases through the Website. Plaintiff Traicoff consistently declines non-essential cookies on all websites she visits as a matter of personal-privacy practice. In connection with her visit to Defendant's Website, Plaintiff Traicoff engaged with Defendant's Cookie Banner and Cookie Settings and declined all non-essential cookies, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Traicoff reasonably believed that by rejecting non-essential cookies and only allowing strictly necessary cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Plaintiff Traicoff more recently visited the Website on March 30, 2026, in connection with the investigation of this case, and attempted to disable the Tracking Tools on the Website by using the Cookie Banner and Cookie Settings to decline all non-essential cookies. Despite Plaintiff Traicoff's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Traicoff's browsing activity, device identifiers, and related metadata to the Tracking Entities. The interception disclosed the substance of Plaintiff Traicoff's communications with the Website, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Traicoff's clear refusal of non-essential tracking technologies. As a result, Plaintiff Traicoff's Sensitive Information was

9

intercepted and recorded without her consent. Had Plaintiff Traicoff known that Defendant's representations in the Cookie Banner and Cookie Settings were false, she would not have relied on Defendant's misrepresentations, would not have continued to use the Website, and would not have made any purchases on the Website.

19.    Plaintiff Lynnmarie Semenza is, and at all relevant times has been, a citizen and resident of the State of New Jersey. Plaintiff Semenza accessed and used Defendant's Website while physically located in New Jersey. Most recently, Plaintiff Semenza visited the Website in or about September 2025 for consumer browsing purposes. Plaintiff Semenza does maintain an account with Defendant and has made purchases through the Website. Plaintiff Semenza consistently declines non-essential cookies on all websites she visits as a matter of personal-privacy practice. In connection with her visit to Defendant's Website, Plaintiff Semenza engaged with Defendant's Cookie Banner and Cookie Settings and declined all non-essential cookies, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Semenza reasonably believed that by rejecting non-essential cookies and only allowing strictly necessary cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Semenza's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Semenza's browsing activity, device identifiers, and related metadata to the Tracking Entities. The interception disclosed the substance of Plaintiff Semenza's communications with the Website, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Semenza's clear refusal of non-essential tracking technologies. As a result, Plaintiff Semenza's Sensitive Information was intercepted and recorded without her

consent. Had Plaintiff Semenza known that Defendant's representations in the Cookie Banner and Cookie Settings were false, she would not have relied on Defendant's misrepresentations, would not have continued to use the Website, and would not have made any purchases on the Website.

20.     Defendant Cricut is a for-profit corporation, incorporated under the laws of the State of Delaware, with its principal place of business in South Jordan, Utah. Cricut designs, manufactures, and sells smart cutting machines, crafting tools, materials, and related accessories through its Website, https://cricut.com/.

## FACTUAL ALLEGATIONS

### I.   How Websites Function

21.     Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

22.     Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

23.     Each webpage has a unique address, and two webpages cannot be stored at the same address.[2]

24.     When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System)

---

[1] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Feb. 17, 2026).
[2] *Id.*

server, which translates the web address of that website into a unique IP (Internet Protocol) address.[3]

25.      An IP address is "a unique address that identifies a device on the Internet or a local network."[4] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[5]

26.      When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[6]

27.      This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure. [7]

---

[3] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 17, 2026).

[4] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 17, 2026).

[5] *Id.*

[6] *Id.*

[7] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 17, 2026).

28.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[8] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters*

29.    Website owners or web developers write and manage the URLs for their websites.

30.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[9] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

31.    The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[10] Today, UTF-8 is the Internet's most common character encoding.[11]

32.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[12] To demonstrate:

---

[8] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).

[9] *Id.*

[10]    *HTML    ASCII    Reference*,    W3    SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Feb. 17, 2026).

[11] *UTF-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Feb. 17, 2026).

[12] *What Is URL Decoding and URL Encoding?*, GOCHYU (last modified Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Feb. 17, 2026).



*Figure 3 – Demonstrating URL encoding and decoding[13]*

33.     Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.



*Figure 4 – Sample webpage used to demonstrate a webpage URL*

---

[13]    Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Feb. 17, 2026).



*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 6)*



*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

34.      After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the

webpage, which is then processed by the user's browser, as it arrives,[14] and rendered into a visual display according to the instructions of the HTML code.[15] This is the visible, and usually interactable, website that most people think of.

35.    To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[16]

36.    Such complex tasks include code used to monitor and report user activity.

37.    In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, when and how they do it, and with what software and hardware.

38.    Unbeknownst to users, as they browse the Website, the Tracking Tools, including third and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

## II.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookies and Tracking Tools

39.    Defendant voluntarily integrated Tracking Tools from various Tracking Entities into its Website's programming. Defendant's use of such tools on its Website is performed

---

[14] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[15] *What Is a URL?*, MOZILLA, (last visited Feb. 17, 2026).

[16] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

16

pursuant to commercial agreements between Defendant and third parties, including Tracking Entities.

40.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and third parties to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, or even hover over.

41.    First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

42.    Third-party cookies are placed by domains other than the Website's domain, such as google.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow third parties to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

43.    As detailed further below, Tracking Tools, including first and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to

17

intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

44.    Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as users' Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

45.    Defendant owns and operates the Website, which allows users to browse and purchase crafting machines, accessories, materials, and other crafting products; explore project ideas and design resources; create and manage user accounts; access customer service and product support; and view promotional offers. When users interact with the Website by navigating pages, clicking links, entering information, uploading or designing projects, or purchasing Cricut products, they communicate directly with Defendant.

46.    Defendant chooses to place the Tracking Tools on the Website such that when users visit the Website, both first-party and third-party cookies are placed on users' devices and/or monitored for and transmitted those cookies to Tracking Entities, combined with parameters, metadata, and detailed Request URLs. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over

18

whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

47.     Defendant explains its use of Tracking Tools on the Website's Cookie Settings by stating, in substance:

> When you visit our website, we store cookies on your browser to collect information. The information collected might relate to you, your preferences or your device, and is mostly used to make the site work as you expect it to and provide a more personalized web experience. However, you can choose not to allow certain types of cookies, which may impact your experience of the site and the services we are able to offer. Click on the different category headings to find out more and change our default settings according to your preference. You cannot opt-out of our First Party Strictly Necessary Cookies as they are deployed in order to ensure the proper functioning of our website (such as prompting the cookie banner and remembering your settings, to log into your account, to redirect you when you log out, etc.).[17]

48.     The Cookie Settings state that users can reject non-essential cookies, including performance and targeting (advertising) cookies, and can opt out of the sale or sharing of personal information on the Website, including through a "Do Not Sell or Share My Personal Information" option.

49.     The Cookie Settings further state that "Targeting Cookies" are used to build profiles for individual users and show them relevant advertising across the internet:

50.     These cookies may be set through our site by our partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites, limit how often you see the same ads on our site, and allow us to display and deliver content related to your interests. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.[18]

---

[17] The Cookie Banner as it appeared on the Website as of Feb. 26, 2026.
[18] *Id.*

51.     The Cookie Settings further state that "Performance Cookies" are used to count visits and traffic and to improve the performance of the website:

52.     These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous. If you do not allow these cookies, we will not know when you have visited our site, and will not be able to monitor its performance. [19]

53.     The Cookie Settings further state that "YouTube.com Cookies" are used by Google to collect user data and display targeted advertising:

> YouTube is a Google-owned platform for hosting and sharing videos. YouTube collects user data through videos embedded in websites, which is aggregated with profile data from other Google services in order to display targeted advertising to web visitors across a broad range of their own and other website. YouTube.com Cookies are also deemed Targeting Cookies (see above definition). [20]

### III.    The Website's Cookie Banner Misled Users

54.     When users in locations such as California visited the Website, the Website immediately displayed the Cookie Banner. The Cookie Banner informed users of the Website as follows:

55.     This website uses cookies and other tracking technologies to enhance user experience, to display personalized advertisements and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. You can exercise your rights to opt-out of sale of processing personal data for targeted advertising by clicking the link on the right.

---

[19] *Id.*
[20] *Id.*

56.    The Cookie Banner further presented users with buttons labeled "Accept Cookies," "Reject All," and "Do Not Sell or Share My Personal Information," and a close ("x") icon in the top right corner to dismiss the banner. The Cookie Banner disappears if "Accept Cookies" or "Reject All" is selected, or if a user clicks the "x" icon to close the banner. Clicking the "Do Not Sell or Share My Personal Information" button opens the Cookie Settings.



*Figure 7 –Cricut's Cookie Settings, representing that users can manage the use of cookies or the sharing or sale of personal data*

57.    Website users can manage their consent preferences through the Cookie Settings, which indicate that users may control the collection and use of their personal information by toggling options such as the share or sale of personal information and choosing to allow only strictly necessary cookies.

58.    Upon expanding the section addressing the sale or sharing of personal information and targeted advertising, Defendant represented to users, in substance, that they could exercise their right to opt out of the sale or sharing of personal information by using the toggle switch, and

21

that if users opted out, Defendant would not provide personalized advertising and would not expose users' personal information to third parties. Specifically, Defendant informed users: "Under the CCPA and other applicable state laws, you have the right to opt-out of the sale or sharing of your personal information to third parties[...] You may exercise your right to opt out of the sale or sharing of personal information by toggling this switch to the left and selecting 'Confirm My Choices'. This will prevent further cookies from being placed on your device. If you opt out, we will not be able to offer you personalized ads, although you may still see online ads related to our products and services." Defendant's offer was not only to discontinue disclosures through cookies, but a blanket discontinuation of the sale or disclosure of personal information to third parties.

59. After users disabled the sharing of their personal information or declined all cookies other than those strictly necessary, users were permitted to continue browsing the Website. At that point, the Cookie Settings window disappeared.

60. Defendant's representations in its Cookie Banner and Cookie Settings led Plaintiffs, and would reasonably lead all Website users similarly situated, to believe that they had successfully disabled all Tracking Tools other than strictly necessary cookies, and thusly disabled the sale or sharing of their Sensitive Information. Defendant's Cookie Banner and Cookie Settings further led Plaintiffs and all reasonable users to believe that Defendant would not allow third parties, through cookies or similar technologies, to access users' Sensitive Information. Plaintiffs relied and acted upon Defendant's representations by interacting with the Website, including making purchases, after making privacy selections intended to prevent the use of non-essential cookies and disable the sale or sharing of personal data.

61.     These representations were false. In reality, Defendant did not abide by Plaintiffs' or other users' expressed preferences. When users chose to disable the sharing of their personal information and to decline all non-essential cookies, they clearly communicated that they did not consent to the placement or transmission of Tracking Tools other than cookies strictly necessary for the Website's functionality. Nevertheless, Defendant continued to cause the Tracking Tools, including cookies, to be placed or otherwise accessed on users' browsers and devices so that Tracking Entities could intercept, transmit, and use users' Sensitive Information in real time.

62.     The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as an unlawful wiretap, pen register, and trap and trace device when they are executed because they enable Tracking Entities, separate and distinct parties from Defendant, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. The Tracking Entities are not mere passive tools or instruments of Defendant; they collect, analyze, and use the intercepted communications for their own commercial purposes in addition to Defendant's.

## IV.     Defendant's Website Uses Tracking Tools To Spy on Users.

63.     Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

64.     Generally, the Tracking Tools collect information about users' site activity when events specified by the Defendant, like adding a product to the shopping cart or loading specific webpages, are triggered. Defendant added parameters to events that determine just how much data is collected, and how specific that data is.

65.    Parameters are strings of text that website owners add to a URL to track and organize their webpages.[21] URL parameters include key-value pairs formatted as "key=value."

    a.    The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

    b.    The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 8 - Diagram of a URL displaying how parameters function*[22]

### A. TikTok Pixel

66.    TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

67.    The TikTok Pixel is a snippet of code that begins to collect user information the moment a user lands on the Website, before Defendant's Cookie Banner or Cookie Settings advises the user of the invasion or seeks their consent. To use the TikTok Pixel, website operators must

---

[21] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026), https://backlinko.com/url-parameters (last visited Feb. 17, 2026).
[22] *Id.*

include the specific pixel IDs associated with their websites, which allows TikTok to link the collected data back to their individual TikTok business profiles.[23]

68.    Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, as seen in *Figures 11* and *13*—the TikTok JavaScript code in *Figure 11* references Defendant's Pixel ID, whereas the "code" variable in *Figure 13* identifies the TikTok Pixel ID, both of which reference the Pixel ID as "BUI7EI73GOD7OIQQ4CLG".

69.    TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[24]

70.    These event-triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

71.    The TikTok Pixel also collects:

a.    The time website actions took place;

b.    The IP address (which is used to determine the geographic location of a user);

c.    Device information, including make, model, operating system, and browser information;

---

[23]    *See generally Troubleshoot with Pixel Helper*, TIKTOK, *https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en* (last visited Feb. 17, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).
[24] *How to Set Up Events and Parameters with Events Builder*, TIKTOK, *https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters* (last visited Feb. 17, 2026) (describing how to designate events).

> d.    Cookies that can be used to identify users; and
>
> e.    Metadata and button clicks.[25]

72.    The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are and how they navigate around the Website.

73.    TikTok's "Advanced Matching" features allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."[26] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[27] TikTok then provides Defendant with custom audiences based on website user events, like page views or purchases, to model lookalike audiences.[28] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[29]

74.    Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.[30]

---

[25] *About TikTok Pixel*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Feb. 17, 2026).

[26] *About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Feb. 17, 2026).

[27] *How to set up Automatic Advanced Matching*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Feb. 17, 2026).

[28] *Get started with the TikTok Pixel: a small business guide*, TIKTOK (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Feb. 17, 2026) (benefits of using the TikTok Pixel).

[29] *See* Lizzie Davey*, How to use TikTok Pixel: TikTok conversions tracking*, LEADSBRIDGE (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Feb. 17, 2026).

[30] *Id.*

75.    Defendant used the TikTok Pixel to monitor and log, in real time, when users clicked on specific products, loaded webpages, added specific products to cart, and proceeded through the checkout process to payment and shipping.

76.    The TikTok Pixel also captures users' identifying cookies (the _ttp cookie is used to identify TikTok users[31]), and hashed email, which can still be de-anonymized through the use of a tool called a "reverse lookup table."[32]

77.    Plaintiffs had a reasonable expectation that their Sensitive Information, including (i) Plaintiffs' identifying information, (ii) information that designated Plaintiffs as interested in purchasing or otherwise as purchasers of the Defendant's products, and (iii) IP addresses and identifier information relating to who Plaintiffs are and who Plaintiffs were communicating with to obtain the products, would not be exposed to the Tracking Tools placed by Defendant.

78.    Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.[33]

---

[31]    *See    G-Star    Raw:    List    of    Cookies* https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Feb. 17, 2026).

[32]    *Can someone please explain reverse look up tables?*, SOFTWARE ENGINEERING, https://softwareengineering.stackexchange.com/questions/277152/can-someone-please-explain-reverse-look-up-tables (last visited Feb. 17, 2026).

[33]    *See    Benefits    of    using    the    TikTok    Pixel*, TIKTOK,    (Sept.    6,    2024) https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Feb. 17, 2026).

79. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services and to generate its own benchmarking reports to share with other TikTok business customers.[34]

80. According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[35] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[36]

81. An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:

---

[34] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 22, 2025).
[35] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Feb. 17, 2026).
[36] *Id.*



*Figure 9 – Home page of the Website*



*Figure 10 – Using a browser's "developer tools" on Cricut's webpage shows the Website loading TikTok Pixel's code onto the user's browser*



*Figure 11 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

82.     The Website instantly sends communications to TikTok when a user views the page and tracks page interactions. The screenshots below show the sample webpage along with the webpage code. including the various TikTok scripts Defendant runs, and the electronic impulses sent to TikTok to add to their collection of user behavior:



*Figure 12 – Sample product on the Website*



*Figure 13 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 12*



*Figure 14 – The "_ttp" cookie placed by the TikTok Pixel*

83.    To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). However, Plaintiff and those similarly situated are never exposed to these terms (nor would they have any reason to look for them) as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiff and Website users.

84.    The TikTok Terms inform website owners using the TikTok Pixel, such as Defendant, that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[37]

85.    The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[38]

86.    TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[39] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

87.    TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of Sensitive Information."[40]

88.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn their users that the Website would disclose their Sensitive Information in a manner that impinges upon their privacy.

---

[37] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), (last visited Dec. 22, 2025).
[38] *Id.*
[39] *Id.*
[40] *Id.*

89. These Tracking Tools continue to intercept users' communications with the Website even when a user chooses to decline all non-essential Tracking Tools (allowing only strictly necessary cookies) and to stop the sale and sharing of their personal information with third parties.

**V.  Defendant Violated CIPA, OWESA, and the Federal Wiretap Act**

90. Courts analyze claims under CIPA, Cal Penal Code § 631, and OWESA at Ohio Rev. Code § 2933.52 using the same framework applied to claims under the federal Wiretap Act. *See Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020); *see also State v. Wallace*, 986 N.E.2d 498, 513 (Ohio Ct. App. 2012); *Luis v. Zang*, 833 F.3d 619 (2016).

91. Cal. Penal Code § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts.

92. Similarly, OWESA at Ohio Rev. Code § 2933.52 prohibits several distinct and independent forms of unlawful interception:

93. No person purposely shall do any of the following:

94. (1) Intercept, attempt to intercept, or procure another person to intercept or attempt to intercept a wire, oral, or electronic communication;

95. (2) Use, attempt to use, or procure another person to use or attempt to use an interception device to intercept a wire, oral, or electronic communication, if either of the following applies:

34

96.     (a) The interception device is affixed to, or otherwise transmits a signal through, a wire, cable, satellite, microwave, or other similar method of connection used in wire communications;

97.     (b) The interception device transmits communications by radio, or interferes with the transmission of communications by radio.

98.     (3) Use, or attempt to use, the contents of a wire, oral, or electronic communication, knowing or having reason to know that the contents were obtained through the interception of a wire, oral, or electronic communication in violation of sections 2933.51 to 2933.66 of the Revised Code.

99.     The federal Wiretap Act likewise prohibits the intentional interception[41] of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

### A. Defendant Intercepted the Contents of Communications in Transit

100.    Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

101.    Here, the network requests intercepted by the Tracking Entities included detailed Request URLs containing the names and file locations of webpages, the products users browsed on the Website, identifying information in the form of cookies, and user activity information indicating users' commercial activity and purchases.

102.    The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began

---

[41] "[I]ntercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

transmitting data to the Tracking Entities as soon as the Tracking Tools loaded onto Plaintiffs' browsers, and additionally transmit data at the moment Plaintiffs submitted information through the Website.

103. This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or otherwise before the communications were transmitted from users' devices, and therefore occurred while the communications were in transit.

104. The Tracking Entities were third parties to Plaintiffs' communications with Defendant's Website, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

105. Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Website, in violation of Cal. Penal Code § 631, Ohio Rev. Code § 2933.52, and 18 U.S.C. § 2511(1)(a).

### B. *Defendant Aided and Abetted Third-Party Interceptions*

106. A party violates Cal. Penal Code § 631, Ohio Rev. Code § 2933.52, and 18 U.S.C. § 2511(1)(a) not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception.

107. Defendant knowingly procured the Tracking Entities to embed and configure the Tracking Tools in its Website, in a manner that enabled the Tracking Entities to intercept the contents of Plaintiffs' communications with the Website.

108. CIPA at Cal. Penal Code § 631(a) requires the prior consent of all parties to the communication.

109.    Both 18 U.S.C. § 2511(2)(d) and Ohio Rev. Code § 2933.52(B)(4) require the prior consent of at least one party to the communication.

110.    Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept their communications and Sensitive Information, before or after the interceptions occurred, nor could Defendant consent to the interception of those communications, as the scope of its consent was bound to the Terms provided by the Tracking Entities, which required obtaining valid consent from Plaintiff and/or otherwise prohibited the use of the Tracking Tools for intercepting sensitive or legally protected data.

### C.  The Tracking Tools are Trap and Trace and/or Pen Register Devices.

111.    California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

112.    California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

113.    Similarly, OWESA defines a "trap and trace device" as "a device that captures the incoming electronic or other impulses that identify the originating number of an instrument or device from which a wire communication or electronic communication was transmitted but that does not intercept the contents of the wire communication or electronic communication." Ohio Rev. Code § 2933.51(V).

37

114.    OWESA defines a "pen register" as "a device that records or decodes electronic impulses that identify the numbers dialed, pulsed, or otherwise transmitted on telephone lines to which the device is attached." Ohio Rev. Code § 2933.51(U).

115.    The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information. As such, the Tracking Tools are "trap and trace" devices.

116.    The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' devices to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' devices.

117.    Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of digital fingerprinting and de-anonymization.

118.    The CIPA at California Pen. Code § 637.2 and OWESA at Ohio Rev. Code § 2933.65 impose civil liability and statutory penalties for the installation of trap and trace software without a court order. No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

119.    Defendant did not obtain Plaintiffs' or the Class Members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

### D. Defendant Promised Users that Tracking Could Be Disabled, but Continued Tracking Anyway

120.    When users visit Defendant's Website, they are presented with a Cookie Banner and Cookie Settings that state that users can control whether their information is tracked and shared with third parties.

121.    The Cookie Banner and Cookie Settings state that users can reject non-essential cookies and prevent the sale or sharing of their personal information. The Cookie Settings provide toggles and controls that allow users to decline tracking technologies that are not necessary for the Website to function.

122.    Users who affirmatively reject all but strictly necessary cookies reasonably believed that non-essential tracking would stop. The interface communicates that users can prevent their browsing activity from being shared with third parties. That representation is false.

123.    Even after users rejected non-essential Tracking Tools and selected only strictly necessary cookies, Defendant continued deploying Tracking Tools that intercepted users' interactions with the Website and transmitted those communications and identifiers to third-party tracking companies.

124.    Users were told they could disable tracking, attempted to disable it, and the Defendant continued tracking them anyway.

### E. Defendant Lacked Consent and Misrepresented the Effectiveness of the Cookie Settings

125.    Plaintiffs' investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users clicked "Accept Cookies" on the Cookie Banner.

126.    As a result, users were tracked from the moment they began using the Website, without prior consent.

39

127.    Plaintiffs visited the Website while those default tracking settings were active.

128.    Users who visit the Website are shown a Cookie Banner offering the option to "opt-out of sale of processing personal data" by clicking the adjacent link to the Cookie Settings.



*Figure 15 – The Cookie Banner shown to users who visit the Website*

129.    Despite those representations, even users who declined all but strictly necessary cookies continued to be tracked by at least TikTok.



*Figure 16- The TikTok Pixel tracking a user who declined all unnecessary cookies*

130.    Defendant intentionally placed TikTok tracking cookies on the Website and allowed TikTok to track users and intercept their communications with the Website, despite stating in the Cookie Banner and Cookie Settings that the Tracking Tools would not be deployed and that users' information would not be shared with third parties unless users affirmatively consented to the same.

40

131.    Representations regarding cookie-consent controls are materially misleading where tracking continues despite a website's claim to the contrary and/or users' opt-out selections.

132.    Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[42]

133.    The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[43]

## CLASS ALLEGATIONS

134.    Plaintiffs bring these claims for relief, individually and on behalf of the following Class and Subclasses, pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3):

> All natural persons who visited and interacted with the Defendant's Website in the United States during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities.

135.    Plaintiffs Fruhmann and Do bring this class action individually and on behalf of the following California Subclass:

---

[42] *See About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Feb. 17, 2026). ; *Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Feb. 17, 2026); *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Feb. 17, 2026).

[43] *See TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Feb. 17, 2026).; *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 17, 2026).

All members of the Class who visited and interacted with the Defendant's Website while located in the State of California during the applicable limitations period (the "California Subclass").

136. Plaintiff Traicoff brings this class action individually and on behalf of the following Ohio Subclass:

All members of the Class who visited and interacted with the Defendant's Website while located in the State of Ohio during the applicable limitations period (the "Ohio Subclass").

137. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

138. Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class and Subclass should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

139. NUMEROSITY: At this time, Plaintiffs do not know the number of Class Members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained via the records maintained by the Defendant.

140. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class Members, and which may be determined without reference to the individual circumstances of any Class Members, include but are not limited to the following:

a. Whether Defendant shared the Class Members' Sensitive Information with the Tracking Entities or other third parties;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether the Class Members are entitled to statutory penalties; and

d. Whether the Class Members are entitled to injunctive relief.

141. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the members of the Class.

142. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

143. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE WIRETAP ACT
### 18 U.S.C. §§ 2510, et seq.
### (On Behalf of Plaintiffs and the Class)

144. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

43

145. Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

146. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

147. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

148. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

149. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

150. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

151. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

152. Defendant is a "person" within the meaning of the Wiretap Act.

153. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

154.    Plaintiffs had reasonable expectations of privacy in their electronic communications with Defendant's Website, including the pages they viewed, searches conducted via the Website, browsing activity, shopping-related interactions, and other interactions with Website features, particularly where Defendant represented through its Cookie Banner, Cookie Settings, and Privacy Policy that users could opt out of the sale/sharing of personal information and decline non-necessary Tracking Tools.

155.    An objectively reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on commercial websites, such as searches, browsing, and order interactions, are sensitive and convey the substance and meaning of the communication, i.e., Sensitive Information.

156.    A reasonable user is entitled to assume that any disclosure of the contents of their communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated as a matter of course.

157.    Plaintiffs reasonably expected that the Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Website without their consent.

158.    Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for combining that information with information collected about Plaintiffs from across the internet and used for advertising, analytics, and marketing optimization.

159. Interception occurred whenever Plaintiff interacted with the Website, including when they navigated webpages, used search or location features, viewed electronics, placed an order, or otherwise communicated information to the Website through their browsers.

160. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website, and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

161. Plaintiffs were never asked to consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, via Defendant's Cookie Settings, Plaintiffs affirmatively declined all Tracking Tools and consented only to the use of cookies that are strictly necessary for the Website's functionality.

162. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. *See* 18 U.S.C. § 2511(1)(a).

163. Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website and allowed them to intercept the communications of users on the Website, in order to subsequently disclose those communications to the Tracking Entities. Those disclosures were made fraudulently, based on Defendant's false representations in the Cookie Banner and Cookie Settings, and constitute unlawful invasions of privacy.

164. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

    a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

    b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

    c.    reasonable attorneys' fees and costs.

**COUNT II**
**COMMON LAW INVASION OF PRIVACY**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Class)**

165. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

166. Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

167. Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the Class Members by, among other things, permitting third-party tracking technologies to collect, track, and compile users' Sensitive Information while representing to users that they could opt out of such collection.

168. Plaintiffs and the Class Members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their Sensitive Information, including browsing activity, device identifiers, and related metadata. Plaintiffs expected that their interactions with the Website would not be shared with third-party analytics providers.

169. Plaintiffs and the Class Members relied on Defendant's representations and exercised the Website's opt-out controls, reasonably expecting that Defendant would honor its

affirmative representation in the Cookie Banner and Cookie Settings that users could opt out of the sale/sharing of personal information and decline non-essential cookies.

170.   Despite Plaintiffs' and the Class Members' opt-outs and affirmative rejection of all but strictly necessary cookies, Defendant permitted third parties to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The third parties used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

171.   Defendant lacked any legitimate business justification for permitting the placement and transmission of the third-party cookies and Tracking Tools that allowed third parties to access, intercept, and collect users' Sensitive Information, contrary to users' express opt-outs.

172.   As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class Members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

173.   Plaintiffs and the Class Members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracking.

## COUNT III
### INVASION OF PRIVACY AND VIOLATION
### OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1
### (On Behalf of Plaintiffs Fruhmann and Do and the California Subclass)

174.    Plaintiffs Fruhmann and Do incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

175.    Plaintiffs Fruhmann and Do bring this cause of action on behalf of themselves and all California Subclass Members.

176.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

177.    California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative."

178.    In support of Proposition 11, voters stated that:

179.    The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

180.    Plaintiffs Fruhmann and Do, and the California Subclass Members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications. Plaintiffs Fruhmann's and Do's, and California

49

Subclass Members' protected interests arise from various statutes and common law, including, *inter alia*, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information."

181. The privacy rights of Plaintiffs Fruhmann and Do, and the California Subclass Members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiff Fruhmann and Do and the California Subclass Members.

182. Plaintiffs Fruhmann and Do, and the California Subclass Members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing their Sensitive Information.

183. By causing third-party cookies and Tracking Tools to be placed on users' browsers and devices and by transmitting users' Sensitive Information to third parties despite users' opt-outs, Defendant violated Plaintiffs Fruhmann and Do's and the California Subclass Members' reasonable expectation of privacy.

184. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

185. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiffs Fruhmann and Do, and the California Subclass Members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

## COUNT IV
## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631
### (On Behalf of Plaintiffs Fruhmann and Do and the California Subclass)

186.    Plaintiffs Fruhmann and Do incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

187.    Plaintiffs Fruhmann and Do bring this cause of action on behalf of themselves and all California Subclass Members.

188.    CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology. *See* Cal. Penal Code § 630.

189.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

51

190.    The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

191.    In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see also Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

192.    The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

193.    Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs Fruhmann and Do and the California Subclass Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate Cal. Penal Code § 631.

194.    Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

195.    Plaintiffs Fruhmann and Do, and the California Subclass Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. Defendant's violations of Cal. Penal Code § 631 constitute unlawful invasions of privacy.

**COUNT V**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638.51**
**(On Behalf of Plaintiffs Fruhmann and Do and the California Subclass)**

196.    Plaintiffs Fruhmann and Do incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

197.    Plaintiffs Fruhmann and Do bring this cause of action on behalf of themselves and all California Subclass Members.

198.    California's Pen Register and Trap and Trace Law is part of CIPA, codified at Cal. Penal Code § 638.51.

199.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

200.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

201.    "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

202.   California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" Cal. Penal Code § 638.51(a).

203.   No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools designed to capture phone numbers, email addresses, routing information, addresses, and other signaling information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

204.   Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiffs Fruhmann's and Do's, and the California Subclass Members' activity on the Website.

205.   Defendant did not obtain consent from Plaintiffs Fruhmann and Do or the California Subclass Members before using pen register or trap and trace technology to identify users of its Website, and has therefore violated Cal. Penal Code § 638.51.

206.   As a direct and proximate result of Defendant's conduct, Plaintiffs Fruhmann and Do, and the California Subclass Members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 638.51.

<u>**COUNT VI**</u>
**Violation of the California Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1770, et seq.**
**(On behalf of Plaintiffs Fruhmann and Do and the California Subclass)**

207.    Plaintiffs Fruhmann and Do incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

208.    The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

209.    Defendant is a person within the meaning of the CLRA.

210.    Plaintiffs Fruhmann and Do are consumers of Defendant's services under the CLRA, as Plaintiffs Fruhmann and Do used Defendant's Website to browse and purchase products.

211.    Defendant undertook deceptive acts or practices in violation of the CLRA by failing to disclose the presence of the Tracking Tools on the Website. Defendant violated Cal. Civ. Code § 1770(a) of the CLRA by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services."

212.    By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(5) of the CLRA by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

213.    By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

214.    Defendant's failure to disclose was material to Website users such as Plaintiffs Fruhmann and Do. Users could have chosen a different website that did not use Tracking Tools. Users could have chosen a website that disclosed the presence of Tracking Tools and allowed them

to be disabled. Users could have chosen a website that requested consent before implementing Tracking Tools.

215.   Defendant undertook deceptive acts or practices in violation of the CLRA by fraudulently misrepresenting the presence of the Tracking Tools on the Website.

216.   By this fraud, Defendant violated Cal. Civ. Code § 1770(a)(5) by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

217.   By this fraud, Defendant violated Cal. Civ. Code § 1770(a)(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

218.   Plaintiffs Fruhmann and Do, and the California Subclass Members, seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

**COUNT VII**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, et seq. ("UCL")**
**(On Behalf of Plaintiffs Fruhmann and Do and the California Subclass)**

219.   Plaintiffs Fruhmann and Do incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

220.   The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

221.   By actively and affirmatively misleading consumers by omitting to inform them of the Tracking Tools on the Website in violation of, *inter alia*, the federal Wiretap Act, the California Constitution, and the CLRA, Defendant has violated the unlawful prong of the UCL.

222.    By actively and purposefully installing a wiretap without a visitor's consent in violation of the federal Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

223.    By actively and purposefully installing a pen register and trap and trace device without user consent in violation of the federal Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

224.    By actively and fraudulently deceiving users about their ability to disable the tracking pixels, Defendant has violated the unlawful prong of the UCL.

225.    Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed users' personal identifying information without knowledge or consent. Defendant disclosed users' information to Tracking Entities to build personal profiles without knowledge or consent. Defendant failed to disclose that it was wiretapping users' communications with the Website. Defendant fraudulently deceived users about its ability to disable the tracking pixels. Through this conduct, Defendant violated the unfair prong of the UCL.

226.    Plaintiffs Fruhmann and Do have standing to bring claims against Defendant under the UCL. Plaintiffs Fruhmann's and Do's information was tracked and recorded without consent. Plaintiffs Fruhmann's and Do's data was used to build personal profiles for advertising purposes without consent.

227.    Plaintiffs Fruhmann and Do would have considered it important to the decision to visit Defendant's Website to know that their data was being tracked and recorded without their consent, and regardless of privacy elections made through the Cookie Banner and Cookie Settings.

228.    Instead, Plaintiffs Fruhmann and Do exercised the Website's privacy controls and continued using the Website in reliance on Defendant's misrepresentations that non-essential

57

Tracking Tools had been disabled and that Plaintiffs Fruhmann's and Do's Sensitive Information would not be sold to or shared with third parties.

229.     Because of Defendant's UCL violations described above, Plaintiffs Fruhmann and Do suffered injury by losing control of their personal data and having their personal information tracked and recorded without their consent.

230.     Plaintiffs Fruhmann and Do, and the California Subclass Members, seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

## COUNT VIII
### COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
#### (On Behalf of Plaintiffs and the Class)

231.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

232.     Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

233.     Defendant made affirmative representations to Plaintiffs and the Class Members through its Cookie Banner, Cookie Settings, and related disclosures that users could opt out of the sale or sharing of their personal information and could decline all non-essential cookies.

234.     Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and performance cookies, and would stop the sale or sharing of users' Sensitive Information with the Tracking Entities.

235.     Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

236.     These representations were false and misleading. Before users, including Plaintiffs and the putative Class Members, were able to exercise the purported opt-in choice provided by Defendant, or otherwise decline all non-essential cookies, Defendant deployed the Tracking Tools

to intercept and collect Plaintiffs' and the Class Members' user data and transmit the same to the Tracking Entities, despite Defendant's representation in the Cookie Settings that it would not track users until they consented to the Tracking Tools.

237.  Defendant knew its representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

238.  Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

239.  Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

240.  Plaintiffs and the Class Members reasonably and justifiably relied on Defendant's misrepresentations by exercising the opt-out controls and continuing to use the Website and make purchases. Had Plaintiffs known that Defendant's representations were false, they would not have used the Website or made any purchases on the Website.

241.  Plaintiffs' reliance was reasonable because Defendant presented the Cookie Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

242.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

243.    Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

244.    Plaintiffs and the Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

**COUNT IX**
**VIOLATION OF THE OHIO WIRETAPPING**
**AND ELECTRONIC SURVEILLANCE ACT**
**Ohio Rev. Code §§ 2933.51, et seq.**
**(On Behalf of Plaintiff Traicoff and the Ohio Subclass)**

245.    Plaintiff Traicoff incorporates by reference all preceding paragraphs as fully set forth and realleged herein.

246.    Plaintiff Traicoff brings this cause of action on behalf of herself and all Ohio Subclass members.

247.    OWESA, codified at Ohio Rev. Code §§ 2933.51, et seq., prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one party to the communication. *See* Ohio Rev. Code § 2933.52(A).

248.    OWESA provides a private right of action to any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of the statute. *See* Ohio Rev. Code § 2933.65(A).

249.    OWESA defines "intercept" as the aural or other acquisition of the contents of any wire, oral, or electronic communication through the use of an electronic, mechanical, or other device. *See* Ohio Rev. Code § 2933.51(C).

250.    OWESA defines "contents" as any information concerning the substance, purport, or meaning of that communication. *See* Ohio Rev. Code § 2933.51(G).

251.    OWESA defines "electronic communication" as a transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted by a wire, radio, electromagnetic, photoelectronic, or photo-optical system. *See* Ohio Rev. Code § 2933.51(N).

252.    OWESA defines "person" to include any individual, partnership, association, trust, or corporation. *See* Ohio Rev. Code § 2933.51(K).

253.    Defendant and Plaintiff Traicoff are "person[s]" within the meaning of OWESA.

254.    The Tracking Tools embedded on Defendant's Website constitute "devices" or "apparatuses" capable of intercepting wire, oral, or electronic communications within the meaning of OWESA at Ohio Rev. Code § 2933.51(D).

255.    Plaintiff Traicoff had a reasonable expectation of privacy in her electronic communications with Defendant's Website, including pages viewed, searches conducted, browsing activity, shopping interactions, and other communications with Website features—particularly where Defendant represented through its Cookie Banner, Cookie Settings, and Privacy Policy that users could opt out of the sale or sharing of personal information and decline non-essential Tracking Tools.

61

256.    An objectively reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on commercial websites—such as searches, browsing activity, and purchasing interactions—are sensitive and convey the substance and meaning of the communication.

257.    A reasonable user is entitled to assume that any disclosure of the contents of their communications occurs lawfully and with consent. To hold otherwise would require users to assume that their privacy will be violated as a matter of course.

258.    Plaintiff Traicoff reasonably expected that the Tracking Entities were not intercepting, recording, or using the contents of her electronic communications with Defendant's Website without her consent.

259.    Within the relevant time period, Plaintiff Traicoff's electronic communications with the Website were intercepted contemporaneously with transmission by the Tracking Tools and transmitted to Tracking Entities without Plaintiff Traicoff's consent, for the unlawful purpose of monetizing the intercepted information, including combining it with data collected across the internet for advertising, analytics, and marketing optimization.

260.    Interception occurred whenever Plaintiff Traicoff interacted with the Website, including navigating webpages, using search or location features, viewing products, placing orders, or otherwise communicating information through their browsers.

261.    At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

262.     Plaintiff Traicoff did not consent to the interception, recording, disclosure, or use of her electronic communications by the Tracking Entities. On the contrary, Plaintiff Traicoff affirmatively declined non-essential cookies and third-party tracking through Defendant's Cookie Settings.

263.     The unauthorized interception and use of Plaintiff Traicoff's electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on its Website. *See* Ohio Rev. Code § 2933.52(A)(1).

264.     Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website and allowed them to intercept user communications in order to disclose those communications to Tracking Entities. These disclosures were made fraudulently, based on Defendant's misleading representations in its Cookie Banner and Cookie Settings, and constitute an unlawful invasion of privacy.

265.     As a direct and proximate result of Defendant's violations of OWESA, Plaintiff Traicoff and those similarly situated have been damaged and are entitled to relief under Ohio Rev. Code § 2933.65, including:

        a.   actual damages suffered and any profits made by Defendant or third parties as a result of the violations;

        b.   statutory damages as permitted by law;

        c.   equitable and declaratory relief; and

        d.   reasonable attorneys' fees and costs.

**COUNT X**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

266. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

267. Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

268. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

269. It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

270. Plaintiffs and the Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class Members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Class Members are entitled to the relief set forth below.

**PRAYER**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

 a. An order certifying the class and making all appropriate class management orders;

 b. For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the respective Class and Subclass and their counsel as Class Counsel;

64

c.   For an order declaring the Defendant's conduct violates the statutes referenced herein;

d.   For an order finding in favor of Plaintiffs, the Class, and the Ohio Subclass on all counts asserted herein;

e.   Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

f.   An award of statutory damages or penalties to the extent available;

g.   For damages in amounts to be determined by the Court and/or jury;

h.   For pre-judgment interest on all amounts awarded;

i.   For an order of restitution and all other forms of monetary relief;

j.   An award of all reasonable attorneys' fees and costs; and

k.   Such other and further relief as the Court deems necessary and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable thereto.


Dated: April 1, 2026                    By: */s/ Beau Burbidge*
                                        Beau Burbidge (Utah Bar No. 17046)
                                        beau@burbidgemitchell.com
                                        Clancey Henderson (Utah Bar No. 17066)
                                        chenderson@burbidgemitchell.com
                                        **BURBIDGE | MITCHELL**
                                        215 South State Street, Suite 920
                                        Salt Lake City, Utah 84111
                                        Telephone: (801) 355-6677
                                        Facsimile: (801) 355-2341

                                        Mark S. Reich*
                                        Gary Ishimoto*

Mark Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com
Email: mjensen@zlk.com

*Attorneys for Plaintiffs and the Proposed Class*

\**pro hac vice* forthcoming